All right. Case number 12-2649, Antoine Jackson v. Gregory McQuiggin. Argument not to exceed 15 minutes per side. Ms. Pajak, you may proceed for the appellant. Thank you. Good morning, Your Honors. Good morning. May it please the Court. Christine Pajak from the State Appellate Defender's Office in Michigan on behalf of Mr. Jackson. Would you like to reserve any time for rebuttal? I would, and thank you for reminding me. I'd like four minutes. Yes, that's fine. Mr. Jackson was convicted here of arson on a prosecution theory that was implausible based on the scientific evidence. Defense counsel here was ineffective, and there's no reasonable argument that she met the standards of Strickland with respect, particularly to the expert witness, and there's no way a court could reasonably determine that there was not prejudice to Mr. Jackson. I want to focus this morning on a decision I'm quite certain both members of the panel who are here today are familiar with, Richie v. Bradshaw, which we've relied on from actually in the state courts. The situation here is not only analogous to Richie, but the defense counsel was more ineffective here. It was the most egregious type of situation where she knew there were problems with the scientific proof. She acknowledged all along she thought that there were problems with the way the fire marshal had investigated this case. To remind the court, the fire marshal's position was that the fire had started on the couch, that accelerants had been used. He wasn't sure what accelerant, but he thought it was windshield wiper fluid based on the fact that there was a full bottle of windshield wiper fluid located in the apartment and that there had been wiper fluid, I guess, poured near the couch and on the couch and then ignited by Mr. Jackson. As the defense expert began explaining at the hearing that we had below, that would have resulted in the person igniting the fire actually igniting themselves. If you're standing in a pool of accelerant starting a fire, you're inevitably going to burn up yourself. In addition, it didn't match up with the evidence because the couch was not the area that was the most involved in the fire. As the fire marshal himself acknowledged, it was actually in the kitchen that the kitchen cabinets had burned and that the scientific evidence and the physical evidence was most consistent with a pot being left on a burner and that's where the fire began. The biggest problem that this petitioner had was all this other evidence about a motive and the last person to leave and he said he was going to take care of her and everything else. I mean, you could have said nothing about the location of the fire or how it started and he was the main suspect, wasn't he? He's been right there? He's the last one to leave? He said he was going to get her? Mr. Jackson did not behave in a way that I would recommend certainly to anybody. He was definitely the last person seen leaving about two hours before the fire was discovered. But the jury was instructed, you know, defense counsel was certainly aware of that and that actually made the expert testimony more important, that it started not by him intentionally starting the fire on the couch but through, as the jury was instructed, the jury was instructed they needed to presume that it was an accidental fire and the expert testimony would have rebutted both the prosecution's expert, whose testimony took up half of the trial, I counted the pages last night, just about 50%. I thought that they didn't find any trace of accelerant. It's true that they found no trace of accelerant but the fire marshal maintained that there was still accelerant there that had not been found either because through his own technique of washing it away, because maybe it hadn't started the right way, he had said all along that he had smelled an accelerant and a bit of a surprise, admittedly, the canine handler, whose report said that the dog did not indicate, testified, oh, my report's wrong, he did, he had indicated, and the fire marshal also testified that he thought the dog had indicated an accelerant. So it wasn't a surprise when the fire marshal came in and said that there was an accelerant. What the expert would have allowed the defense to do is to give the jury a basis for determining, as it was instructed, that it was an accidental fire, that the scientific evidence was consistent with an accidental fire, not with an intentional fire. Wasn't the cross-examination by Ms. Robinson fairly effective? She got witness Mr. Hager to concede to a number of things in terms of, I guess, the lack of smell of gasoline and the things about the burn pattern that would make it more difficult to conclude that an accelerant had been used. Well, a few things with respect to that. It was not effective. She certainly got him to make some admissions, but he never said it was gasoline. He was going with the windshield wiper fluid theory and that the dog had alerted, that she was not attacking. She didn't bring into the courtroom at any point the NFPA 921, and to the extent the court may be familiar with that, it's a scientific treat. I mean, it's a long scientific treat. It's a big long. It's a very long one. Ages in it. Have you read it? I have read it, but not recently. I read it. I haven't read it. I spent a lot of time with it before. Sorry, Your Honor. I spent a lot of time with it before the hearing that we did with the, the abbreviated hearing, I would say, that we did with the experts. It's impressive that she said she committed to memory because that's a difficult task, and it's certainly difficult to cross-examine an expert without having the precise text there. So during the Daubert hearing, she didn't have it. She didn't ask him. She didn't consult an expert before the Daubert hearing, right? She said she spoke with an expert before the Daubert hearing about what maybe you should expect during the Daubert hearing, but not specifically with respect to this case. She didn't ask an expert to take a look at this case and come up with a defense theory about why there was no arson here, where the fire started, to go to the very heart of the prosecution's case. She talked to at least one experienced lawyer who just tried a case like this. I thought that was very unusual. She talked to him, and he said, you know, you've got no problem. There's no corroboration. No problem. She also talked, I think, to an arson expert, right? Right. She did speak to somebody with respect to the Daubert hearing. But like I was saying, she did not provide evidence specifically with respect to this case to get to the scientific evidence that the prosecution was relying on about where the fire started. She was going with this sort of, you know, maybe it's an accident theory because she certainly could not, as I cannot say here today that Mr. Jackson was not the last person seen at the apartment or that Mr. Jackson behaved in ways that, you know, I would certainly say I would not recommend that people do. But that doesn't mean it was an arson. The Supreme Court seems to suggest that there are times when cross-examination will be effective to test the prosecution's scientific evidence. If defense counsel can poke holes in the expert's testimony or theories, you don't always have to have a competing or opposing expert. And so you're not suggesting that defense counsel would always need to have an arson expert. I mean, there are situations where if a defense counsel believes, reasonably so, that he or she can challenge the prosecution's expert, then that would be enough just trial strategy. I'm certainly not going to dispute what the Supreme Court has said, that you don't always have to have a competing expert that's greater minds than mine, of course. But the defense counsel needs to make a reasonable determination that they don't need an expert. And part of that reasonable determination should include talking to the expert about your specific facts of your case and what you have going on in your case. Here's the evidence that I have. Consulting with them about your specific case. Not speaking to them generally, but consulting with them, fully investigating, and then making that determination. And the investigation claim is one that we have argument that has been raised all along, that she did not do enough with respect to the determination not to bring an expert in. An expert would have testified, as Mr. Smith, who helped write 921, testified that the evidence was consistent with the fire being started by a pot being left on the stove. That the fire marshal had swept things away, had looked for the bottom of a pot to be charred, and had not looked through the debris in a way that would have allowed him to find the melted pot. That would have given the defense and the jury a point to say, yes, we have this instruction that says that we have to assume that the fire was accidental. That there's no physical evidence to say that the fire started someplace else. And that the prosecution... Was there any witness who testified about a pot being left on the stove while the stove was on? Because did Wilkinson testify or did Jackson? Jackson did not testify. Wilkinson did not. She was not there beforehand. There was not a pot found on the stove. The burner was on. It seems like a kind of a speculative idea if it started with a pot on the stove and nobody said, I left the pot on the stove. Well, the way the fire started, and the arson investigation is a science, that the fire began in the kitchen. That there was a flashover in the kitchen that spread to the other room. That the kitchen had the most damage, not the couch. The kitchen cabinets were gone. The couch remained. The frame of the couch was still there. So it didn't make sense, based on the physical evidence, to say that the fire had started anyplace else but on the stove. And they... They never testified that the, whatever they called it, the gold spigot or whatever it was was open. Right. That it was on, but that that would be expected because when the fire department comes in to put out a fire, they turn off the gas to the stove. So you wouldn't expect the burner to still be on because they're putting the fire out in the apartment. I see that I've used up all of my time here. We'll have your full rebuttal. Thank you. Thank you. Good morning. May it please the Court. Michigan Assistant Attorney General Bruce Edwards appearing on behalf of the warden. This is a habeas case, so as this Court well knows, it's subject to the very deferential standards limited by AEDPA. And the petitioner can only obtain relief if he can show an unreasonable application of Strickland in this case. Now, fortunately, nobody was hurt in this arson, and that led to the defendant getting a relatively short sentence, and, in fact, he was already paroled six months ago. So this is the first case I've argued where the defendant was not incarcerated. Now, the only claim is that the defense attorney should have done more, should have retained an expert, should have cross-examined the fire marshal more thoroughly. Now, the Supreme Court has indicated that when you have Strickland, you have to show deficient performance and prejudice attributable to it, and when the case is on habeas, you have to also show that the Michigan Court of Appeals resolution of the claim was unreasonable. So they call that double deference. And the likelihood of a different result has to be substantial, not just conceivable. And my position is they haven't shown anything more than a conceivable difference. What did the Michigan court do? Did they decide that conduct was deficient and there was no prejudice, or did they define both? They said they did not think it was deficient, but even if it was deficient, there was no prejudice. That's right. Now, fortunately, in this case, we actually had an evidentiary hearing after the trial, and the attorney testified. And she was asked, you know, why didn't you call an expert? And they went into all of this. So that's very helpful in this case. And she explained that she had over 30 years' experience of trying cases in criminal law appeals and trials, and that she had spoke to an expert, she spoke to other attorneys, she read a multitude of articles. And Strickland says you have to evaluate what the attorney did when they did it. Now, when she made her decision not to retain an expert, what was the facts? The facts were the fire marshal said, I think an accelerant happened near the couch. But the Michigan State Crime Lab said, There's no accelerants on these samples you sent to us. And the report from the dog handler said the dog did not alert anywhere. She knew that aboard the trial. She knew both of those things, and that's when she said, Well, gee, I don't think I need an expert. Because the fire marshal has nothing to support his own testimony. In fact, his testimony is going to be contradicted by the reports that I have. Now, that's a relatively reasonable thing to conclude. In fact, she testified that the defendant himself agreed not to call an expert. Now, the Seventh Circuit has held that if a client agrees, when he has all the necessary information, that he can't even argue ineffective assistance if he agreed not to call an expert. And the cite to that is United States v. Weaver, 882 F. 2nd at page 1140. Now, Judge Seiler, you mentioned this other evidence. And that's my real argument, is that even if the defense attorney could have persuaded the jury that the fire marshal Hager's theory that an accelerant was used was wrong, they still would have convicted. And that's really what the trial judge and the Michigan Court of Appeals said. And they listed several things, and some of them have already been mentioned, but I'd like to mention all of them. He previously had threatened to burn down the apartment. On the night of the fire, he sought a gun from a friend so he could kill his girlfriend. On the night of the fire, he smashed his girlfriend's car when it was parked, or the girlfriend's mother's car, when the girlfriend was in the mother's house. He was the only person besides the girlfriend who had a key to the apartment. He was the last one seen leaving the apartment two hours before the fire started. And a gas burner was left on. And then finally, the defendant's expert said, I can't rule out arson, I just rule out an accelerant. So the fire could have been deliberately started, just not with an accelerant. So given all those circumstantial facts, the jury might well have said, we don't agree with Hager at all, but we still find that he deliberately set the fire, and so therefore they wouldn't necessarily find him guilty of arson. Now at the end of, it's quite interesting, at the end of the attorney's testimony at the evidentiary hearing, as she's getting ready to step down, the judge says, and this is on page ID 808, the court, you did a lot more than a lot of lawyers I see every day would probably have done to prepare. And then defense counsel, in an unguarded moment of candor, said, I think she did a very fine job. Well, so do I. Now the district court basically adopted the same position that I've taken, and that is, you know, what the attorney did was reasonable, when she made her decision based on the facts that were before her, and you can't find prejudice. And in fact, as you mentioned, Judge Seiler, and I think Judge Cole, she did, defense counsel elicited several concessions on cross-examination, and the United States Supreme Court has never said you have to call an expert in every case. They even said there's no Newton's Third Law when somebody calls an expert that you have to have a counter-expert. They said many times it's better to do so. In fact, the defense attorney testified at the Ginther hearing, in her experience of over 30 years, that when there's a prosecution expert and a defense expert, the juries frequently discount what the defense expert says and think they're just saying that because they got paid to say that, and the prosecutors usually argue that as well. And so she felt like, you know, based on her own experience, that, you know, I really don't need an expert here. Even if I were to call one, I'm not sure it would really move the ball forward in her case. Now, in her brief, opposing counsel cites two cases in particular, Dugas v. Copeland, and that's a First Circuit case, where the First Circuit was critical of an attorney in an arson case. But we need to hear the rest of the story. And if you will shepherdize Dugas v. Copeland, you'll see that the First Circuit said we find efficient performance, but we cannot find prejudice, so they remanded for a determination of prejudice. The district court said, I don't find prejudice, and then on appeal to the First Circuit, they affirmed. And the cite to that is 506F3rd, page 1. So that case doesn't really help much. The other case that opposing counsel mentioned this morning, Ritchie v. Bradshaw, which, Judge Cole, you wrote, this was a death penalty case where the state called six experts, and the court criticized defense counsel for not mounting a this was not arson defense. Well, this case is the exact opposite of Ritchie v. Bradshaw because the defense attorney did mount a this was not arson. In fact, it was an accident defense. So I don't see how Ritchie helps opposing counsel's case at all. Now, Jackson argues in his brief on page 47, there was no risk to calling an expert. But the Supreme Court in Knowles v. Mirzant at 556 U.S. at page 123 said they rejected the Ninth Circuit ruling that, well, there was nothing to lose. Opposing counsel had nothing to lose. He could have done thus and such. And they said, that's not strict law. I'm not saying you had nothing to lose. You've got to show it was required, and it was not required in this case. Now, also, interestingly, Jackson accuses the Michigan Court of Appeals of using the wrong test for Strickland in her brief. Now, if you'll look at star 6 of the opinion, they use the exact correct test from Strickland. And then on the next page, they use a shorthand phrase. And she's attacking the shorthand phrase that they use. But there's plenty of cases that say, if the state court identifies the correct test the first time they mention it, it's not wrong to use a shorthand thereafter, especially when state court opinions are to be given the benefit of the doubt. And the U.S. Supreme Court has admitted that it's done the very same thing itself in some of its opinions. I think if you'll see Woodford v. Bisciotti, that happened where the court left out the word probable one time. Now, ironically, not only do the Michigan Court of Appeals not use the wrong test, but opposing counsel uses the wrong test. On page 50 of her brief, she cites the, at least one juror might have struck a different balance test that's traceable to Wiggins, a 2003 case, a death penalty case from the United States Supreme Court, where they were reviewing a Virginia death penalty where the jury verdict has to be unanimous in order to give the death penalty. So if the jury votes 11-1 to give the death penalty, the defendant gets life. And so that's why if you have a 12-0, if only one juror might have looked at things differently, then you might be able to satisfy Strickland in a death penalty scenario. Now, when they talk about striking a different balance, what are they talking about? They're talking about aggravating and mitigating circumstances that are presented at the death penalty phase of the trial. Well, Michigan, of course, doesn't have the death penalty, and there was no mitigating or aggravating evidence that was submitted to the jury for them to strike a different balance regarding. This wasn't a homicide case anyway, right? So the correct test in Strickland specifically says that a reasonable probability that the fact finder might have had a reasonable doubt respecting guilt. So the fact finder in this case was the jury. So it's not enough if one of the jurors might have seen things differently. There must be a reasonable probability that the jury itself might have seen things differently. So the Wiggins test does not even apply in this case, and I urge the court not to follow that. Now, the Supreme Court, you know, they concluded that in habeas, you can't get habeas unless there's been an extreme malfunction in the state system. There is no extreme malfunction here. The district court correctly found that the defense attorney was able and capable. Before trial, she got the defendant's prior conviction suppressed in case he testified he wasn't going to be able to be impeached with it. She got some statements the defendant made suppressed as well so that they couldn't use anything that he said in his defense. And the statements against him at trial. She called, had a Dawbert hearing, and she exposed some weaknesses in Fire Marshal Hager's testimony and his analysis, but ultimately determined because of two reports that she had that would contradict what Hager was going to say, that she didn't need an expert of her own. And she could rely on the cross-examination. You didn't find any evidence of any accelerants based on the scientific test of the carpet or something, right? That's correct. And then the report on the dog handler was that the dog didn't alert, but he testified later to the contract. That was a shock at trial. The defense attorney was blindsided, as she explained, at the evidentiary hearing. So, you know, if I was on the jury and that dog handler said, oh, yeah, by the way, my report actually, I meant to say the exact opposite thing that I said, I might not have paid too much attention to it. And I honestly think that it's very likely that this jury wasn't persuaded regarding the use of an accelerant, but they were persuaded because of the threat to burn the house down, the threat to kill the woman, the last one to leave, the only other person with a key. All those items together provided circumstantial evidence that in fact an arson had occurred here. What was Hager's idea as to where this started? He thought it started right near the couch with an accelerant.  Michigan State Police said we don't find any accelerants here. Now, you know, there was an offer of proof at the Ginther hearing that another prosecution expert would have provided testimony that actually supported what Hager said, but the judge didn't take that testimony, so we don't have it. But we do have an offer of proof of that. So as we have right now, you know, it's just Hager said X, and then the defense expert after the fact says, no, there was no accelerant, but I can't rule out arson. Well, if you can't rule out arson, and we have all this other circumstantial evidence, then the defense attorney did as good a job as she could. You know, the case was stacked against the defendant. You know, he was offered a sweetheart deal before trial, and he turned it down, and, you know, he rolled the dice, and, you know, the jury did what they did, and it's not really his attorney's fault that he was convicted. In fact, I found one case that says, we recognize the tendency when all else fails, blame the attorney. And this is really what's happening here. This attorney did a fine job, and at least at one time, defense counsel agreed that she did a fine job, but she's not arguing that today, obviously. So because there was no extreme malfunction, I ask this court to affirm the district court denial of habeas relief. If there are no questions, I'm done. Okay? Thank you. Thank you. Your Honor, just a few things in rebuttal. One of the things that Ms. Robinson testified to at the Ginther hearing was that she knew that the fire marshal was going to say that he smelled an accelerant, and that's at page ID 774. She said, I knew he was going to say he smelled an accelerant, and that I couldn't impeach that. The way she could have impeached it was by having an expert of her own to come in to testify to say that the way that the fire marshal was determining that there was an accelerant was contrary to the scientific standards, that his theory was scientifically improbable, that it didn't implausible for the fire to have started physically the way that he had said that it had done. Had she done that by an expert or by this big, long treatise that you're talking about? Well, she certainly could have used the treatise to do that as well, but what the treatise alone could not, the treatise could have said the way that you're determining, looking at the burn patterns is inconsistent with NFPA 921, and the way that you're deciding there's an accelerant contrary to what the police lab is doing, all of that is contrary to the treatise. What an expert could have added and why an expert is particularly important when you do have the evidence of what I would certainly admit are facts that are not favorable to Mr. Jackson is something that would support the theory that it was an accident and not an arson, and she did not have that. She did not put on evidence of somebody coming in and saying the most likely way and the most likely place that this fire started was on the stove, and what the expert testified to is a little more complicated than just, I can't rule out arson. It was the way that we look at this scientifically is to talk about it in a more nuanced way than yes, an arson, no, an arson. His testimony was it started on the stove, that there was a pot left on the stove with a burner on that is consistent with it not being an intentional fire, and the jury was instructed that they were to decide to start with this presumption that it was not an intentional fire. With evidence that it was an intentional fire, that there is an accidental way that this fire could have started, totally and entirely different than what the prosecution expert testified to. There's a reasonable probability that the jury would have found differently, and this is why an expert was important there. Let me ask you this. So it appears that Ms. Robinson discussed with Mr. Jackson the decision not to have an expert arson witness, and that he concurred what we know, presumably, in her recommendation, but they had a discussion. And we don't have any indication in the record that Mr. Jackson did not understand the arguments that Ms. Robinson was making, that he was somehow uninformed or not completely knowledgeable. So why shouldn't we align ourselves with, I think it's the Seventh Circuit case, and conclude that, look, he made an informed decision not to have an expert. He didn't think he needed one. Well, he didn't make it. I would say that we've been saying she didn't make an informed decision not to have an expert, so there's no way he could have made an informed decision. He's certainly not an attorney. He's relying on her expertise as a lawyer. So if the lawyer comes in and has not conducted the full investigation, which is something that has been our position all along, and it's certainly not true that I think that she did a fine job with respect to the expert, and that is certainly not at all what I meant at the time or a position I have ever taken. But Mr. Jackson was not, I'm sure you knew that, but I wanted to make sure it was crystal clear, that a client is relying on the expertise of a lawyer. If the lawyer has not made an informed decision herself that an expert isn't necessary, then there's no way that a client can make an informed decision. I think we understand your argument. Your time has expired. I appreciate your arguments this morning, and the case will be submitted. Thank you.